J-S84043-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| SHAMONE F. WOODS | |
| Appellant | No. 1012 EDA 2016 |

Appeal from the Judgment of Sentence January 6, 2014
in the Court of Common Pleas of Chester County Criminal Division
at No(s): CP-15-CR0004219-1009

BEFORE: OLSON, SOLANO, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED MARCH 20, 2017**

Appellant, Shamone F. Woods, appeals from a judgment of sentence of life imprisonment for first degree murder.[1] Appellant argues that the trial court abused its discretion by refusing to grant a mistrial when (1) a Commonwealth witness, Victor Devalia, testified that he offered to take a lie detector test after his arrest for this murder,[2] and (2) another Commonwealth witness, Andre Boggs, testified that he "did time" with Appellant in prison. We affirm.

We summarize the factual and procedural history to place Devalia's and Boggs' trial testimony in context. Several men, including Appellant,

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

[2] The police initially charged Devalia with the murder but ultimately withdrew all charges against him.

formed a conspiracy to murder Jonas Suber. The leader of the conspiracy, Duron Peoples, held a grudge against Suber for having a brief romance with Peoples' girlfriend several years earlier. Peoples recruited Eric Coxry to shoot Suber and had Appellant supply a .45 caliber semiautomatic pistol to Coxry. On October 21, 2006, Coxry used this weapon to shoot and kill Suber in Suber's Coatesville, Pennsylvania residence.

An intricate web of circumstantial evidence demonstrates Appellant's participation in the murder plot. Devalia testified that two days before the murder, he and Peoples drove from Atlanta, Georgia to Chester County. On the afternoon before the murder, surveillance cameras showed Peoples and Appellant entering a Home Depot in Downingtown, Pennsylvania at exactly the same time but through different entrances. Inside the Home Depot, Peoples gave Appellant cash to pay Coxry for shooting Suber. Peoples and Devalia traveled to Peoples' aunt's townhouse, where Peoples extracted a .45 caliber semiautomatic pistol and told Devalia that "this is what the big boys use to get the job done." Peoples and Devalia subsequently drove to the Regal Theatre, where Peoples donned an Afro wig, entered the theatre and gave the pistol to Appellant. Finally, Peoples and Devalia began their return trip to Atlanta.

April Brown testified that on the afternoon before the murder, Appellant directed her to go to Philadelphia to pick up Coxry and bring him to Coatesville. Appellant met Coxry and Brown in a Coatesville apartment

and walked over to a second apartment. Clarence Milton, Appellant's friend and associate, testified that in the second apartment, Coxry removed a .45 caliber semiautomatic weapon from his pants and stated that he was in town to take care of some business to kill Suber. According to Milton, Appellant replied that he had twenty grand for Coxry to do the job.

Brown testified that she took Coxry to a bar named The Bongo, and Appellant met them at this club later in the evening. Suber's brother, Boggs, testified that Suber was at the Bongo that evening. Suber left the Bongo in a white Cadillac, and Appellant, Brown and Coxry followed the Cadillac to another bar, the Vets.

While Peoples and Devalia were driving to Atlanta, Devalia overheard two phone conversations between Peoples and Appellant during which they discussed "clubbing" and "burn[ing] the house down." Upon arriving in Atlanta, Peoples informed Devalia that Suber had been shot.

A few days after Suber's death, Appellant admitted to Brown that he obtained money for Coxry to kill Suber. Two years later, in October 2008, Appellant admitted to Delita Torres that "we paid some guy in Philly" to kill Suber.

Several weeks after the murder, detectives searched Peoples' aunt's townhouse and found a box of .45 caliber cartridges with ten cartridges missing, corresponding roughly with what the detectives found at the

murder scene. The detectives did not find the .45 caliber semiautomatic pistol in the townhouse.

The jury found Appellant guilty of (1) first degree murder, (2) conspiracy to commit first degree murder,[3] (3) criminal solicitation to commit first degree murder,[4] (4) second degree murder,[5] (5) burglary[6] and (6) aggravated assault.[7] On January 6, 2014, the trial court sentenced Appellant to life imprisonment for first degree murder and a concurrent term of eighteen to forty years' imprisonment for the remaining offenses. On February 11, 2014, Appellant filed an untimely direct appeal. On March 11, 2015, this Court quashed Appellant's appeal as untimely. On February 10, 2016, Appellant timely filed a petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, alleging ineffective assistance of counsel for filing an untimely appeal. On March 4, 2016, the trial court granted Appellant leave to appeal to this Court *nunc pro tunc* within thirty days. On March 24, 2016, Appellant timely appealed to this Court. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

---

[3] 18 Pa.C.S. § 903.

[4] 18 Pa.C.S. § 902.

[5] 18 Pa.C.S. § 2502(b).

[6] 18 Pa.C.S. § 3502(a).

[7] 18 Pa.C.S. § 2702(a)(1).

- 4 -

We now turn to the testimony of Devalia and Boggs at the heart of this appeal. Devalia testified that two days before the murder, he and Peoples drove from Atlanta, Georgia to Chester County. N.T., 10/23/13, at 10-12. Devalia's purpose for the trip was to deliver a pit bull puppy to another man in Chester County. *Id.* On the afternoon before the murder, Devalia and Peoples were driving to the Home Depot in Downingtown when Devalia heard Peoples contact Appellant on a "chirp" phone, *i.e.*, a walkie-talkie. *Id*. at 25, 30. Later that day, Devalia drove Peoples to Peoples' aunt's residence, where Peoples retrieved two handguns. *Id.* at 36, 76-78. Devalia and Peoples then drove to the Regal Theatre, which Peoples entered by himself, and then began driving back to Georgia. *Id.* at 39-43, 78-81. During the return to Georgia, Devalia heard another chirp phone conversation between Peoples and Appellant. Appellant told Peoples that he, Appellant, was "clubbing," and Peoples told Appellant to "lay on him." *Id.* at 44-46. Devalia inferred that the meaning of "clubbing" was to "hurt somebody." *Id.* at 46. Later during the same trip, Devalia overheard another chirp conversation in which Peoples instructed Appellant to "burn the house down." *Id.* at 48. Appellant replied: "I got you, I got you." *Id.* At the conclusion of the return trip, Peoples told Devalia that Suber had been shot. *Id.* at 49.

During Devalia's testimony, the prosecutor asked: "To address [defense counsel's] insinuation that you were involved [in Suber's murder,]

- 5 -

can you assure us that you were not involved in any respect?" *Id.* at 103.

Devalia replied: "Yes sir. And when I was arrested I offered a lie detector

test twice." *Id.* Defense counsel moved for a mistrial. The trial court

denied the motion and gave the following instruction to the jury:

> Ladies and gentlemen, the last answer which was given, volunteered by this witness regarding a lie detector is hereby stricken from the record. I do instruct you to disregard that testimony and strike it from your consideration. You're not to use that testimony in your deliberations. Is there anyone seated on the jury who believes they will not be able to follow that instruction? If you think you will not be able to follow my instruction or that you will not follow my instruction[,] please raise your hands now. Let the record reflect that no juror has raised their hands in response to the striking instructions.

*Id.* at 105-06.

The next Commonwealth witness, Boggs, was Suber's brother and was

not involved in his murder. Boggs testified that on the evening before the

murder, he and Suber met Appellant at the Bongo, and Appellant shook

Boggs' hand. *Id.* at 118. When the prosecutor asked whether Appellant

shook Suber's hand, Boggs stated: "No. We were a little more familiar. We

did time together." *Id.* Defense counsel again moved for a mistrial. The

trial court denied a mistrial and gave the following instruction to the jury:

> Ladies and gentlemen, once again I'm going to strike certain testimony from your consideration. The part of the answer given by this witness to the last question – and I'll mention it so you're clear exactly what it is, that he had done time together with a particular individual[,] is stricken from the record.

- 6 -

> I instruct you to disregard that testimony that I [have] just stricken from your consideration and not to use that testimony in your deliberation.
>
> And once again[,] I'll ask is there anyone here that will not follow that instruction? If you believe you will not follow my instruction[,] please raise your hands. Let the record reflect no juror has raised their hand.

*Id.* at 119-20.

Appellant raises two arguments in this appeal:

> 1. Whether the trial court erred by not granting a mistrial following an exchange during examination between the prosecutor and a witness, Victor Devalia, during which Mr. Devalia stated that his assurance that he was not involved in the murder was based on his willingness to submit to a lie detector test two times when he was arrested?
>
> 2. Whether the trial court erred by not granting a mistrial following an exchange during direct examination between the prosecutor and a witness, Mr. Boggs, during which Mr. Boggs stated that he was familiar with the Appellant because they did time together?

Appellant's Brief at 3.

Appellant first argues that the trial court erred by refusing to grant a mistrial when Devalia testified that he offered to take a lie detector test after his arrest for Suber's murder. Appellant contends that the prosecutor's question induced Devalia to give this testimony, which improperly bolstered his credibility. We disagree.

The court may grant a mistrial "when an event prejudicial to the defendant occurs during trial." Pa.R.Crim.P. 605(B). A mistrial is a remedy of last resort; "[a] trial court is required to grant a mistrial only where the

alleged prejudicial event may reasonably be said to have deprived the defendant of a fair and impartial trial." ***Commonwealth v. Fortenbaugh***, 63 A.3d 191, 193 (Pa. 2013) (citation and quotation marks omitted). The decision to deny a mistrial is subject to review for abuse of discretion. ***Id.***

> In determining whether a testimonial reference to a polygraph test warrants a mistrial, three factors are generally considered: (1) whether the Commonwealth prompted the reference to the polygraph test; (2) whether the reference suggested the results of the polygraph; and (3) whether the trial court issued prompt and adequate instructions regarding the unreliability and inadmissibility of polygraph tests . . . After consideration of these three factors, courts must assess the resulting prejudice to the defendant, an evaluation which turns on whether such reference, considered in light of the circumstances of the case, causes an inference to arise as to the defendant's guilt or innocence.

***Id***. (citations omitted).

Appellant fails to satisfy any of these three criteria. First, the prosecutor's question to Devalia—"[t]o address [defense counsel's] insinuation that you were involved [in Suber's murder,] can you assure us that you were not involved in any respect?"—did not prompt Devalia to refer to a polygraph test. The prosecutor only asked Devalia to assure the jury that he was not involved in Suber's murder. We agree with the trial court that the prosecutor "did not refer to, or even obliquely hint at, a polygraph test, and [Devalia's] statement about the polygraph was completely unprompted." Trial Ct. Op., 4/29/16, at 4. Second, Devalia did not state that he actually underwent a polygraph test, let alone suggest its results.

Third, the trial court immediately instructed the jury to disregard Devalia's statement. We acknowledge that the trial court did not follow **Fortenbaugh's** directive to instruct that polygraph tests are "unreliabl[e] and inadmissibl[e]." **Fortenbaugh**, 63 A.3d at 193. Nevertheless, the court asked whether any juror could not follow its instruction to disregard Devalia's statement, and no juror answered in the affirmative. **See Commonwealth v. Chmiel**, 30 A.3d 1111, 1184 (Pa. 2011) (citation omitted) ("[t]he law presumes that the jury will follow the instructions of the court"). Finally, we conclude that Devalia's fleeting statement about volunteering to take a lie detector test did not prejudice Appellant. This statement was entirely collateral to the issue of Appellant's guilt or innocence. The only inference that could possibly have arisen from Devalia's reference to a lie detector test was that Devalia was credible, not that Appellant was guilty. Having studied the record, we conclude that the verdict was entirely the result of the substantial body of circumstantial evidence summarized above.

Appellant's second argument is that the trial court should have granted a mistrial when Boggs testified that he and Appellant "did time together." We disagree.

The trial court perceptively observed:

> We first observe that the meaning of "we" as used by [Boggs] is not entirely clear, as it could represent [Boggs] and [Appellant], or [Boggs] and the victim. Assuming it does pertain to [Appellant], this vague statement was the

only reference made to [Appellant]'s prior criminal history. [Boggs] did not give any specificity as to the reason [Appellant] was incarcerated, or how long he was in prison. As with the other complained-of statement, the Commonwealth did not elicit the testimony, but rather it was volunteered by [Boggs] after answering the Commonwealth's actual question. The court also again gave a prompt limiting instruction following the sidebar conference . . .

The statement about [Appellant]'s incarceration was a "singular, passing reference," unclear in both form and substance, that was volunteered by [Boggs]. Other than the statement itself, the record does not demonstrate any prejudice to [Appellant] caused by the statement, especially in light of the court's prompt limiting instruction to the jury.

Trial Ct. Op. at 7. We agree with this analysis and conclude that no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/20/2017